IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



GARY OLIVER,

    Plaintiff,

v.                             Civil Action No. 3:10cv47

OMEGA PROTEIN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (Docket No. 3) by Defendant Omega Protein, Inc. ("Omega"). For the reasons that follow, the motion will be denied.

### BACKGROUND

The Plaintiff, Gary Oliver, a Virginia resident, works as an independent contractor refilling propane tanks. The Defendant, Omega, a Virginia corporation, owns 100-lb. propane tanks that it uses for cooking on some of its commercial fishing boats. Omega maintains a fleet of ten to twelve fishing boats, two of which (the *Lancaster* and the *Conrad*) use 100-lb propane tanks of the type at issue in this action. Each tank measures approximately five feet in height and eighteen inches in diameter. Omega owns eight to twelve of these tanks, which it

uses exclusively on the *Lancaster* and the *Conrad*. Both of these ships keep two propane tanks on board at a time when the ship is out to sea. While one of the tanks is connected to the fuel line of the galley stove and used for cooking, the other tank is set aside in storage.

Because of propane's explosive qualities, the tank not in use must be stored in an unenclosed area of the vessel. Both the *Lancaster* and the *Conrad* have designated storage areas for the propane tanks. The storage areas on deck are covered by an overhang, and are set back some distance from the gunwales, but are otherwise exposed to the elements. If one of the propane tanks is used up completely while the ship is at sea, that tank is replaced with the second propane tank. The length of time when these ships are fishing is such that no more than two tanks of propane are necessary to cook for the duration of the expedition.

When a ship returns to port, empty tanks are unloaded for refilling on land, and new tanks are taken aboard to replace them. Omega protein does not track which propane tanks are on a particular ship at a particular time, or which tanks remain in land-based storage while the others are aboard a ship. Omega considers the maintenance, storage, and handling of these tanks to be on the "marine side," as opposed to the land-based "plant side," of its business.

On May 15, 2008, Oliver was refilling a propane tank on Omega's premises in Reedville, Virginia, when the tank exploded, causing him serious and permanent injury. Oliver alleges, and supports his allegation with affidavits from experts, that the explosion was proximately caused by Omega's negligent storage of propane tanks on its fishing boats. Although the explosion occurred very near the shoreline on premises supporting Omega's marine operations, it happened on dry land.

Oliver then filed this action. Although the Complaint did not state a specific basis for jurisdiction, subsequent briefing has revealed that the sole alleged basis for subject matter jurisdiction is in admiralty. Specifically, the Plaintiff asserts that the Extension of Admiralty Jurisdiction Act of 1948, Pub. L. No. 80-694, ch. 526, 62 Stat. 496, now codified at 46 U.S.C. § 30101 (hereinafter "EAJA"), confers federal jurisdiction over this action.

After Omega filed the present motion to dismiss for lack of subject matter jurisdiction, and that motion was fully briefed, the Court ordered the parties to proceed with discovery, and to file supplemental briefs on the issue of admiralty jurisdiction when discovery closed. The supplemental briefing is complete, and the issues are ripe for resolution.

## DISCUSSION

A. Applicable Law

Fed. R. Civ. P. 12(b)(1) governs a motion to dismiss for lack of subject matter jurisdiction. It is the burden of the party bringing a case to prove the existence of subject matter jurisdiction. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). In assessing a motion to dismiss under Rule 12(b)(1), the Court may consider evidence outside the pleadings without converting the motion to one for summary judgment. Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).

In such a posture, "[t]he district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists" as to the existence of subject matter jurisdiction. Potomac R.R., 945 F.2d at 768. "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id.

Because the citizenship of the parties is not diverse, and the parties do not raise any questions of substantive federal law, the only conceivable basis for subject matter jurisdiction is in admiralty. Federal jurisdiction over "[a]ny civil case of

4

admiralty or maritime jurisdiction" is rooted in Article III, § 2 of the United States Constitution, and admiralty jurisdiction is statutorily bestowed upon district courts by 28 U.S.C. § 1333(1). Congress broadened admiralty jurisdiction in 1948 by enacting the EAJA to cover "cases of injury or damage, to person or property, caused by a vessel on navigable waters, *even though the injury or damage is done or consummated on land.*" 46 U.S.C. § 30101(a) (emphasis added).

The legislative history of the EAJA, as described by two leading maritime law scholars, shows congressional intent "to benefit the owners of land-based structures that were damaged in a collision with a vessel." David W. Robertson and Michael F. Sturley, The Admiralty Extension Act Solution, 34 J. Mar. L. & Com. 209, 248 (2003). The legislative history articulates a primary concern with fixing remedial asymmetries between land and sea-based litigants when, for example, a boat collides with a pier.[1] Decisions construing admiralty jurisdiction, however, has not limited jurisdiction to events of this nature.

---

[1] Under pre-EAJA law, "when a vessel and a land-based structure collided and litigation ensued between the vessel owner or operator and the owner of the land-based structure, a federal court had admiralty jurisdiction over only half of the dispute. Admiralty jurisdiction reached the vessel's claim against the land-based owner but not the land-based owner's claim against the vessel." Robertson & Sturley, supra, at 245. Compare Panama R.R. Co. v. Napier Shipping Co., 166 U.S. 280, 284 (1897) (upholding jurisdiction over a shipowner's suit for damage incurred when the vessel collided with underwater

In the case that both parties cite as the leading case synthesizing relevant precedent, Jerome B. Grubart v. Great Lakes Dredge & Dock Co., the Supreme Court upheld admiralty jurisdiction under 28 U.S.C. § 1333, declining to "consider [the] alternative argument that the [EAJA] provides an independent basis of federal jurisdiction." 513 U.S. 527, 543 n.5 (1995). However, Grubart did include the EAJA within its analytical framework, and is instructive as to the presence of jurisdiction in the case at bar.

In Grubart, the Court assessed an allegation that a contractor negligently had replaced pilings along the banks of the Chicago River, a navigable waterway. The work in question was performed by using a barge in the river. Seven months after the work was performed, flooding occurred on land along the riverbank. The flooding, alleged the plaintiff, was caused by the contractor's negligence in replacing the pilings, the replacement having weakened structures within the river that prevented flooding. After the district court dismissed the case for lack of admiralty jurisdiction, and the Seventh Circuit reversed the district court, the Supreme Court addressed the issue of "whether or not a federal admiralty court has

---

portions of a pier) with Martin v. West, 222 U.S. 191, 197 (1911) (rejecting jurisdiction over a pier-owner's suit against a vessel, the negligent operation of which caused damage to the pier).

jurisdiction over claims that . . . faulty replacement work caused the flood damage." Id. at 531.

As Grubart explained, before the EAJA, the only jurisdictional question to ask was whether the tort occurred entirely upon navigable waters. Id. at 531-32. If not, federal courts had no admiralty jurisdiction. However, the EAJA was enacted "to end concern over the sometimes confusing line between land and water, by investing admiralty with jurisdiction over 'all cases' where the injury was caused by a ship . . . on navigable water, even if such injury occurred on land." Id. at 532.

After noting a judicially crafted exception to exclude certain "odd cases" from the admiralty docket,[2] id., the Court outlined the two inquiries that a court must undertake to determine the presence of admiralty jurisdiction under 28 U.S.C. § 1333(1). The first inquiry is rooted in statutory text, both of § 1333(1) and the EAJA: whether the tort occurred on navigable water or was caused by a ship or vessel on navigable water. The second, bipartite inquiry involves determining whether the type of incident "has 'a potentially disruptive

---

[2] The only example of such an "odd case" discussed in Grubart was Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249 (1972), which held that an airplane crashing into a navigable waterway did not give rise to admiralty jurisdiction because the alleged tort did not have "a significant relationship to traditional maritime activity." Grubart, 513 U.S. at 533 (quoting Executive Jet, at 260).

7

impact on maritime commerce,'" and then assessing "whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" Id. at 534 (quoting Sisson v. Ruby, 497 U.S. 358, 363-65 (1990)).

The first inquiry, often referred to as the "location" test, is relatively straightforward. The tortious act occurred on navigable waters, or it was caused by a ship on navigable waters, or admiralty jurisdiction is unavailable. Id. In the Fourth Circuit, the ship, while on the water, must *proximately* cause an injury on land to trigger jurisdiction under the EAJA; simple causation in fact, or "but for" causation, is not enough. Pryor v. Am. President Lines, 520 F.2d 974, 979 (4th Cir. 1975); accord In re Madison Coal & Supply Co., 321 F. Supp. 2d 809, 813 (S.D. W. Va. 2003).

Applying the test to the facts before it, Grubart first found the location test "readily satisfied," 513 U.S. at 534, because all of the tortious activity in question occurred in a navigable waterway, and the injury was inflicted in the waterway as well. The Court further recognized that "a vessel" caused the harm, because "maritime law [] ordinarily treats an 'appurtenance' attached to a vessel in navigable waters as part of the vessel itself." Id. at 535. Although the injury was alleged to have been caused by a crane on the barge, and not by

the barge itself, the injury was nonetheless caused by "a vessel." Id. Furthermore, Grubart found no jurisdictional flaw in the seven-month delay between the injury and the subsequent flooding, so long as the maritime tort proximately caused the injury. Id. at 535-38.

The Court then turned to the second, judicially constructed part of the analysis, the "maritime connection inquiries," id. at 538. The Court observed that the potential disruption of maritime commerce concomitant with this type of tort was significant -- both the flow of the waterway and the traffic allowed to use the waterway were affected by the accident. Id. at 539. And, "repair or maintenance work on a navigable waterway performed from a vessel" unquestionably was "substantially related to traditional maritime activity." Id. at 540.

Grubart concluded by tacitly acknowledging that the "maritime connection inquiries" almost never defeat admiralty jurisdiction. "Although . . . not . . . every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, . . . ordinarily that will be so." Id. at 543. And, as noted in Madison Coal, a subsequent district court case within the Fourth Circuit, the crucial inquiry is whether the claimant's injury "was caused by a

9

tortious act done by the vessel while on navigable waters." 321 F. Supp. 2d at 813.

B.  **The EAJA Confers Jurisdiction over the Case at Bar**

Before applying the Grubart framework to the facts of this action, it is helpful to clarify the extent to which Grubart controls analysis under the EAJA. Grubart found it unnecessary to root its holding in the EAJA because, according to the allegations, the tort in question was fully consummated in the navigable waterway when the contractor weakened the existing structures within the river. In this case, however, the EAJA is necessary for admiralty jurisdiction to lie, because the injury occurred wholly on land, although it was allegedly caused by tortious conduct committed on a vessel in navigable waters. Although Grubart did not apply the EAJA, it did incorporate the Act into its formulation of the inquiry into the existence of admiralty jurisdiction. Grubart, 513 U.S. at 532-34. Thus, Grubart provides a useful framework for analyzing EAJA jurisdiction, as well as more traditional admiralty jurisdiction under 28 U.S.C. § 1333(1).

As to the first inquiry, the "location test," the plaintiff alleges that one of two ships, and likely both,[3] negligently left the propane tank, which eventually exploded, exposed to the sun

---

[3] Because Omega did not track the location of its propane canisters, the location of a particular tank at a particular time is unascertainable.

and surf while the vessel was at sea fishing for menhaden. Oliver has shown that the propane tank was an appurtenance of the ship, and has produced evidence that the proximate cause of his personal injury was the negligent acts or omissions of the ships' crew that occurred while the ships were on navigable waters.[4] Contrary to Omega's argument, Oliver does not allege that mere proximity to the water confers jurisdiction, but rather that his injury flowed from negligent acts and omissions of the tank by sailors while the tank was on a ship at water. Thus, the location test is met.

Omega argues that the plaintiff has produced insufficient evidence to support its theory of proximate causation. However, Oliver has produced the affidavits of three experts who provide evidence creating a factual dispute as to what caused the propane tank explosion, and, specifically, whether negligent storage and maintenance of the propane tank by Omega's ships, while they sailed the seas, proximately caused Oliver's injury.

---

[4] Indeed, Oliver alleges that the ship itself contributed to the tank's dangerous condition. See Pl. Supp. Reply at 18 (arguing that "the corrosion process aboard Omega Protein's vessels was caused and accelerated by chronic internal vibrational forces of the vessel itself"). This is not the Plaintiff's strongest argument. However, the argument is jurisdictionally superfluous because "[t]here is no distinction in admiralty between torts committed by the ship itself and by the ship's personnel while operating it." Grubart, 513 U.S. at 535 (quoting Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 210 (1963)).

11

There is thus factual support for the maritime causation necessary to sustain admiralty jurisdiction.

Omega further contends that the injury was not caused by an appurtenance of the vessel, because the propane tank is not inherently marine, but rather is an object with both land-based and marine uses. However, Black's Law Dictionary (8th ed. 2004) defines an "appurtenance" as "[s]omething that belongs or is attached to something else; e.g., the garden is an appurtenance to the land." Although propane tanks certainly have non-marine uses, the record shows that Omega used propane tanks such as the one in question for the sole purpose of cooking in its ships' galleys. The raison d'être for the tank in question, and others like it that Omega uses, is exclusively maritime.

Omega cites several decisions for the proposition that the propane tank, as a matter of law, cannot be an appurtenance. Def. Supp. Memo. at 14-15. However, the cited decisions actually support the opposite conclusion. When injury is caused by cargo that has not yet been placed upon a ship (<u>Sacilotto v. Nat'l Shipping Corp.</u>, 520 F.2d 983 (4th Cir. 1975)), or a forklift that operates entirely on a dock (<u>Victory Carriers, Inc. v. Law</u>, 404 U.S. 202, 213 (1971)), then it is not caused by an appurtenance of a vessel such as to enable admiralty jurisdiction. However, when the injury is caused by "part of the ship's usual gear or [equipment] that was stored on board,"

Victory Carriers, at 213, such causation allows for admiralty jurisdiction, provided the other jurisdictional prerequisites are met. And, as Oliver points out, a shipowner's "'failure to supply and keep in order the proper appliances appurtenant to the ship' has long been recognized as a part of American admiralty law." Garrett v. Gutzeit O/Y, 491 F.2d 228, 233 (4th Cir. 1974) (quoting The Osceola, 189 U.S. 158, 175 (1903)).

Secondly, the accident in question implicates a traditional maritime activity. The ship's galley is a prerequisite for any medium to long seafaring voyage. Although the purpose of the voyage is not to eat, a vessel's commercial purposes would go unfulfilled if its crew went hungry. Galleys are an integral part of the commercial fishing industry, as well as other types of maritime commerce, and the mechanism that fires the grill has significant implications for ships and their sailors.

In sum, Oliver has satisfied both the location test and the maritime connection inquiries, and admiralty jurisdiction is proper.

## CONCLUSION

For the foregoing reasons, Omega's MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (Docket No. 3) will be denied.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 16, 2010