**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **GARY OLIVER,** | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL NO. 3:10cv47-REP-DWD |
| **OMEGA PROTEIN, INC.,** | ) | |
| Defendant and Third-Party Plaintiff, | ) | |
| v. | ) | |
| **GEORGE NOBLETT, INC.** and **NORTHERN NECK GAS COMPANY,** | ) | |
| Third-Party Defendants. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Third-Party Defendant Northern Neck Gas Company's motion to dismiss the Amended Third-Party Complaint (Docket No. 56), and Third-Party Defendant George Noblett, Inc.'s motion to dismiss the Amended Third-Party Complaint (Docket No. 64). The matter has been thoroughly briefed by the parties and the Court has entertained oral argument on the motions. For the reasons set forth herein, the Court recommends that Third-Party Defendant Northern Neck Gas Company's motion to dismiss be GRANTED, and that Third-Party Defendant George Noblett, Inc.'s motion to dismiss be DENIED.

# I. BACKGROUND

The Court has reviewed the Amended Third-Party Complaint, as well as the attached documents. The Court assumes that all well-pleaded allegations therein are true and views the facts in the light most favorable to the Third-Party Plaintiff, the non-moving party, as is required when resolving a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). See Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Applying that standard, the Court has concluded that the following narrative represents the facts for purposes of resolving the motion.

On March 2, 1992, Zapata Haynes Corporation ("Zapata Haynes") entered into a "Master Service Contract" (the "Contract") with George Noblett, Inc. ("GNI") to govern the sale and service of propane and propane tanks. (Am. Third-Party Compl. ¶ 17, Ex. A.) Pursuant to the Contract, Zapata Haynes would purchase propane and equipment from GNI, which would also service the equipment, and the terms of the Contract would govern future purchases. (Id. ¶ 22.) The Contract includes the following relevant terms:

> 8.A. At any and all times during the term of this Contract, CONTRACTOR agrees to carry insurance of the types in the minimum amounts as follows: . . . Comprehensive General Liability Insurance . . . of Five Hundred Thousand United States Dollars (US$500,000) . . . Umbrella or Excess liability Insurance . . . with a minimum liability of One Million United States Dollars (US$1,000,000) . . . and [such insurance] shall not be cancelled, altered or amended without thirty (30) days' prior written notice . . . to ZAPATA . . . [such insurance shall be] endorsed in the following manner: . . . (2) ZAPATA CORPORATION and its affiliated subsidiary and/or interrelated companies are hereby named as Additional Assured.
> . . . .
> 9. Each party hereto agrees to release, protect, indemnify, defend and hold the other party hereto harmless from and against all liability, claims, demands and causes of action of every kind and character (including, but not limited to, the cost of the defense thereof, the cost of prosecuting and defending cross-claims and in establishing such party's right to indemnification) for injury to or death of and/or loss of or damage to property of the indemnitor and its invitees, howsoever caused

and even though caused by the negligence of the indemnified party, its invitees or anyone for whom they may be acting.

10. CONTRACTOR agrees to release, protect, indemnity [*sic*], defend and hold ZAPATA harmless from and against any and all liability, claims, demands and causes of action of every kind and character (including, but not limited to, the cost of defense thereof, the cost of prosecuting and defending cross-claims and third-party claims and in establishing ZAPATA's right to indemnification), arising in favor of third parties for personal injury/death and/or loss of or damage to property but only if such losses are caused by CONTRACTOR or its invitees' negligence and even though such losses may have been caused or contributed to by the joint or concurrent negligence (including, but not limited to, any preexisting condition, unseaworthiness or a vessel, product liability, merchantability or other legal right of recovery) of ZAPATA or its invitees. Notwithstanding the foregoing, CONTRACTOR is not obligated to indemnify ZAPATA for ZAPATA's sole negligence causing any such loss to any third party.
. . . .
16. In addition to all other indemnifying provisions contained herein, CONTRACTOR agrees that it will require all subcontractors engaged by it to provide insurance and indemnity agreements affording ZAPATA the same protection as provided in the insurance and indemnity agreements contained in the Contract.
. . . .
21.A. The term "invitees" as used herein shall mean the employees, employees of subcontractors of, and invitees of a party hereto. Employee status shall be determined solely by payroll listing without regard to allegations of or judicial findings of or judicial findings of "borrowed servant" status or similar legal theories.
. . . .
D. The term "ZAPATA" as used herein shall include the company named in the first paragraph of this Contract, Zapata Corporation, and its other affiliated, subsidiary and/or interrelated companies, and such companies' officers, employees and invitees.

E. The term "CONTRACTOR" as used herein shall mean the company named in the first paragraph of this Contract and all affiliated, subsidiary and/or interrelated companies including the officers and employees of such companies.

(Id. at Ex. A.) At all times material hereto, these terms governed the sale and service of propane from GNI to Omega. (Id. ¶ 20.)

Zapata Haynie Corporation changed its name to Zapata Protein USA, Inc. on March 31, 1994. (Omega's Br. Opp'n Northern Neck's Mot. Dismiss ("Omega's Northern Neck Opp'n") at Ex. I; Omega's Br. Opp'n GNI's Mot. Dismiss ("Omega's GNI Opp'n") at Ex. I.) Similarly, the corporate name was changed from Zapata Protein USA, Inc. to Omega Protein, Inc. on March 9, 1998. (Id.) Thus, through this two-step name change occurring after the parties entered into the Contract, Zapata Haynie Corporation became Omega Protein, Inc.[1]

In the summer of 2002, GNI sold five propane tanks to Omega for use aboard fishing vessels, including tank number 0439304A. (Am. Third-Party Compl. ¶¶ 31-32.) Over the next several years, this tank was regularly and routinely filled by GNI employees. (Id. ¶ 33.) On May 15, 2008, Gary Oliver ("Oliver"), allegedly a GNI employee, was seriously injured while servicing that particular tank at Omega's facilities. (Compl. ¶ 2; Am. Third-Party Compl. ¶ 35.) He has since initiated this action against Omega, and Omega has filed a third-party complaint against GNI and Northern Neck (collectively the "Third Party Defendants") seeking indemnity pursuant to the terms of the Contract. (Am. Third-Party Compl. ¶ 51.) Omega also asserts claims that GNI and Northern Neck breached the Contract by failing to obtain and maintain insurance based on the allegation that GNI's insurance carriers have denied that Omega or its affiliates were "covered" by GNI's policies. (Id. at ¶¶ 46-50, Exs. D, E, F, G.)

---

[1] Third-Party Defendants contend that Zapata Haynie Corporation changed its name to Zapata Protein USA, Inc. in 1990, *before* the parties entered into the Contract. (See, e.g., Northern Neck's Br. Sup. Mot. Dismiss ("Northern Neck Br.") at 7-8.) In doing so, Third-Party Defendants rely on documentation that the Court *may* consider on a motion to dismiss without converting it to a motion for summary judgment. (See Report & Recommendation, Docket No. 53 at 1 n.1 (citing Gasner v. County of Dinwiddie, 162 F.R.D. 280 (E.D. Va. 1995)). Because the exception is permissive, rather than mandatory, the Court views any factual discrepancy between the website and the public records in favor of the Third Party Plaintiff in resolving the motion to dismiss. See Matkari, 7 F.3d at 1134.

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citation omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Matkari, 7 F.3d at 1134; see also Martin, 980 F.2d at 952. This rule, however, is inapplicable to legal conclusions. Ashcroft v. Iqbal, 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009).

## III. DISCUSSION

Third-Party Defendants contend that Omega has no standing to bring a claim pursuant to the Contract and that the Contract releases both Third-Party Defendants from liability for injuries

to their own employees.[2] In addition, Northern Neck separately challenges Omega's attempt to "pierce the corporate veil," asserting that Northern Neck cannot otherwise be bound to the Contract. The Court first addresses Northern Neck's separate challenge of Omega's veil piercing claim, because resolution of that claim determines whether Northern Neck may be bound to the Contract in the first instance. The Court will then address the underlying contract issues as they pertain to those parties obligated thereby.

A.  **"Piercing the Corporate Veil"**

Unlike GNI, Northern Neck cannot generally be held liable under the provisions of the Contract because it was not a party to the Contract. Omega was previously granted leave to amend its Third-Party Complaint so that it may plead a theory that Northern Neck may be held liable as a third-party. (Report and Recommendation, Docket No. 53 at 9 n.5.) Such theories of alternate liability might include "assumption, . . . incorporation by reference, third-party beneficiary theories, waiver and estoppel." (Id. at 6 n.4 (quoting Arthur Andersen LLP v. Carlisle, 129 S. Ct. 1896, 1902 (2009)(citation omitted).) Here, however, Omega asserts only that Northern Neck is liable as GNI's "alter ego" by "piercing the corporate veil." (Am. Third-Party Compl. ¶¶ 52-53.) Specifically, Omega claims that GNI used Northern Neck "to defraud and wrong" Omega "in an effort to evade GNI's individual obligations." (Am. Third-Party Compl. ¶ 52.)

---

[2]This Court has already ruled that Northern Neck was not a party to the Contract. However, Omega seeks to bind Northern Neck to the Contract on a theory that the "corporate veil" between GNI and Northern Neck has been pierced. (Am. Third-Party Compl. ¶¶ 52-53.)

1.) **"Backwards" Piercing of the Corporate Veil**

As a preliminary matter, Northern Neck argues that Omega impermissibly seeks to pierce the corporate veil "backwards." (Northern Neck's Br. at 4.) That is, Omega could pierce the corporate veil of Northern Neck, if at all, only as a way to hold GNI liable. Northern Neck cites no authority in limiting the doctrine as such, and nothing otherwise suggests that the doctrine is so inflexible.

Virginia courts have indeed recognized a concept known as "reverse veil piercing," such as where a corporation is held liable for fraudulent acts of its shareholders. See C.F. Trust, Inc. v. First Flight Ltd. P'ship, 580 S.E.2d 806, 810 (Va. 2003). At oral argument, Northern Neck attempted to distinguish the holding in C.F. Trust, noting that the Supreme Court of Virginia found that such a situation involved an "extraordinary exception." Id. at 810 (citations omitted). In doing so, however, the Court was merely reiterating Virginia's generally "stringent" standards required to disregard corporate formalities, finding that all such circumstances are "extraordinary." Id. at 811. In addressing the lack of a directional limitation on the doctrine, the Court emphasized that "there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action." Id. at 810. Moreover, the Court found that the same factors for traditional veil piercing apply to reverse veil piercing. Id. at 811. Thus, the Court's reasoning is based on substance, not form. Therefore, if Omega pleads facts sufficient to satisfy the heavy burden that Virginia imposes on a party seeking to pierce the corporate veil, it could do so "backwards" to establish Northern Neck's liability for any misconduct on GNI's part.

**2.)   Standards for Veil Piercing**

Ordinarily, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits -- Virginia in this case. Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). However, where, as here, parties to a contract have expressly declared that the agreement shall be construed with reference to the law of a particular jurisdiction other than Virginia, Virginia courts will recognize such agreement and apply the law of the stipulated jurisdiction. Paul Bus. Sys. v. Canon U.S.A., Inc., 397 S.E.2d 804, 807 (Va. 1990) (citations omitted). The Contract's forum selection clause in this case dictates that the laws of the State of Louisiana shall apply and, therefore, Louisiana law will govern this Court's construction of the Contract. (Am. Third-Party Compl. at Ex. A.)

Although Louisiana courts have not explicitly ruled on the appropriate choice of law for so-called "alter ego" claims, the Fifth Circuit, as the governing federal court for Louisiana, has predicted that Louisiana courts would look to the law of the state of incorporation. Lone Star Industries, Inc. v. Redline, 757 F.2d 1544, 1548 n.3 (5th Cir. 1985) (citing QuickC, Inc. v. QuickC International, 304 So.2d 402, 406-407 (La. App. 1974)). Here, both GNI and Northern Neck are Virginia corporations, so Virginia law shall apply.

Virginia law allows for the possibility that affiliates can be "alter egos" of each other. Buffalo Wings Factory, Inc. v. Mohd, Case No. 1:07cv612, 2008 U.S. Dist. LEXIS 82247 at *19 (E.D. Va. Oct. 15, 2008) (citing C.F. Trust, Inc. v. First Flight Ltd. P'ship, 111 F. Supp. 2d 734, 741 n.17 (E.D. Va. 2000)). However, "[i]n Virginia, unlike in some states, the standards for veil piercing are very stringent, and piercing is an *extraordinary measure* that is permitted only in the most egregious circumstances." Id. at *16 (emphasis added). "A court can pierce the corporate

8

veil only upon a showing that (1) the corporation was the 'alter ego, alias, stooge, or dummy' of the other entity; and (2) 'the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime.'" Id. at *19 (quoting Cheatle v. Rudd's Swimming Pool Supply Co., 360 S.E.2d 828, 831 (Va. 1987)).

Omega has pled sufficient facts to satisfy the first part of the test. According to its pleading, which must be taken as true for purposes of resolving the motion to dismiss, GNI and Northern Neck share fictitious names, business locations, owners, telephone numbers, registered agents, corporate officers, and delivery trucks. (Am. Third-Party Compl. ¶¶ 5-14.) Indeed, the parties have not disputed that aspect of the veil-piercing analysis. Thus, the first prong of the test is met.

Omega's pleading fails, however, with regard to the second prong of the test. In its Amended Third-Party Complaint, Omega states in conclusory fashion that the interchangeability of Northern Neck and GNI effected a fraud or wrong on Omega. (Id. ¶ 52.) Iqbal, 129 S. Ct. at 1949. The pleading is otherwise devoid of any factual allegations of how, in fact, GNI was committing a fraud through Northern Neck. See C.F. Trust, 580 S.E.2d at 811. Such a void is magnified by the strictures of Fed. R. Civ. P. 9(b), which requires such allegations of fraud to be pleaded with particularity.

At oral argument, Omega argued that the facts alleged in paragraphs 37 through 43 of its Amended Third-Party Complaint establish the second prong of the analysis. In those paragraphs, Omega alleges that the insurers of both Third-Party Defendants refused to tender a defense to Omega for Oliver's lawsuit. Omega argues that such a failure to tender a defense constitutes an evasion of GNI's personal obligations owed to Omega. In doing so, Omega seeks to elevate a

9

mere breach of contract to the level of an "extraordinary" legal wrong. The argument must fail because the mere breach of a contract is not generally considered an "injustice," or an act giving rise to an "unfair advantage." See, e.g., Station #2, LLC v. Lynch, 695 S.E.2d 537, 541 (Va. 2010) (refusing to permit a "mere breach of contract to constitute an 'unlawful act' for the purposes of the conspiracy statute"). Moreover, Omega has failed to plead any fact showing how GNI used the separate corporate entity, Northern Neck, to evade liability. Indeed, as discussed in further detail, *infra*, Omega has sufficiently pled that GNI breached the Contract, regardless of any corporate formalities distinguishing it from Northern Neck.

In addition, and apart from the allegations in the Amended Third-Party Complaint, Omega asserts that GNI is perpetrating a fraud by claiming that Oliver is not its employee, but an employee of Northern Neck. (See Omega's Northern Neck Opp'n at 8-9.) But a motion is not a pleading, and so the allegations of the motion cannot be considered in resolving the motion to dismiss. See Structural Concrete Prods., LLC v. Clarendon Am. Ins. Co., 244 F.R.D. 317, 324 (E.D. Va. 2007) (citing Mellon Bank, N.A. v. Ternisky, 999 F.2d 791, 795 (4th Cir. 1993)). Even if those allegations were considered, it is difficult to determine how GNI may avoid its duty to indemnify Omega if Oliver is, in fact, an employee of Northern Neck. Pursuant to the plain language of the Contract, the "Contractor" (i.e. GNI) must indemnify Omega for injuries to its employees. In turn, the "Contractor" is defined to include "all affiliated, subsidiary and/or interrelated companies including the . . . employees of such companies." (Am. Third-Party Compl. at Ex. A.) The definition of "invitees" further broadens indemnification to apply to employees of subcontractors. (Id.)

Simply because Northern Neck is not a party to the Contract, and cannot itself be bound as a party, does not necessarily relieve GNI from its own obligation to indemnify Omega *for injuries to Northern Neck employees*. As explained in this Court's previous report and recommendation (Docket No. 53), the Contract's referential definition of "Contractor" to include "affiliated, subsidiary, and/or interrelated companies" does not necessarily bind those affiliates when, as here, there are no other facts supporting a finding that GNI possessed authority to bind them. However, the referential term does indeed bind GNI to indemnify Omega for injuries to affiliates' employees. From the facts pleaded here, Oliver is indeed an employee of, at the very least, an interrelated company or a subcontractor (i.e. Northern Neck). Thus, Omega has stated a claim for relief against GNI that does not require veil piercing, which weighs against such an extraordinary remedy. See C.F. Trust, 580 S.E.2d at 811 ("[t]he court must also consider the availability of other remedies the creditor may pursue").

Because Omega fails to plead facts sufficient to satisfy the second requirement to pierce the corporate veil, and because Northern Neck is not a party to the Contract, Northern Neck cannot be bound thereto. Therefore, the Court recommends that Northern Neck's motion to dismiss be granted on such a basis, and that Northern Neck be dismissed from this case.

**B.    Omega's Standing to Enforce the Contract**

GNI argues that Omega has no standing to seek relief pursuant to the Contract because it is neither a party to the Contract, nor an appropriate successor in interest.[3] Indeed, the Contract

---

[3] Northern Neck joins GNI in this argument, as well as the argument concerning the construction of the indemnity provision in the Contract, *infra*. Because the Court recommends dismissal of Northern Neck on the corporate veil issue, the Court addresses the issues with reference only to GNI. The Court notes, however, that the same analysis would apply to Northern Neck if it was, indeed, bound to the Contract.

does not identify Omega as a party thereto because "Omega Protein, Inc." did not exist in 1992 when the Contract was signed. Rather, the Contract names a predecessor corporation, "Zapata Haynie Corporation," as the entity doing business with GNI. In 1994, then again in 1998, Zapata Haynie Corporation changed its name, ultimately becoming "Omega Protein, Inc." (Omega's Northern Neck Opp'n at Ex. I.) Contrary to GNI's contentions, such name changes do not foreclose standing to sue on the Contract.[4]

Where a change of corporate status results in a "mere continuation" of a party to a contract, the new entity is bound to the contract under Virginia law. See Kaiser Foundation Helath Plan v. Clary & Moore, P.C., 123 F.3d 201, 204-05 (4th Cir. 1997) (citing Harris v. T.I., Inc., 413 S.E.2d 605, 609 (Va. 1992)); accord Bourque v. Lehmann Lathe, Inc., 476 So. 2d 1125, 1127 (La. Ct. App. 1985).[5] Such a situation usually arises in the context of a merger or acquisition, where the general rule is that "a company that purchases or otherwise receives the assets of another company is generally not liable for the debts and liabilities of the selling company." Id. at 204. An exception applies where "the purchasing corporation is merely a continuation of the selling corporation." Id. A mere name change, with nothing more, falls within this exception.

---

[4]There was some suggestion at oral argument that the succession of corporate entities involved more than a mere name change. For purposes of the motion to dismiss, however, Omega has pleaded sufficient facts, taken as true, to establish that the succession amounts no more than a mere name change. See Martin, 980 F.2d at 952.

[5]Both parties consistently cite Virginia law despite paragraph 23 of the Contract, which selects the law of Louisiana. (Am. Third-Party Compl. at Ex. A.) There does not appear to be any applicable conflict between Virginia law and that of Louisiana, but the Court cites to authority from both jurisdictions to reflect such consistency where appropriate.

Moreover, the Contract defines Zapata Haynie Corporation to include "affiliated, subsidiary and/or interrelated companies." (Am. Third-Party Compl. at Ex. A.) Such a definition suggests a mutual intention of the parties to bind the corporation even after a mere name change.

Therefore, this Court recommends that GNI's motion to dismiss be denied insofar as Omega has standing to enforce the Contract.

**C.     Indemnity**

GNI takes the position that the indemnity provisions of the Contract relieve them from liability for any injuries caused to their own employees.[6] (Northern Neck's Br. at 9; GNI's Br. at 2-3.) In doing so, it contends that the very provision on which Omega relies to establish indemnity does just the opposite. Thus, the Court must interpret these provisions pursuant to governing law to determine the effect of the Contract language at issue.

Under Louisiana law, courts interpret contracts pursuant to the general rules contained in articles 2045-2057 of the Louisiana Civil Code. Amend v. McCabe, 664 So. 2d 1183, 1187 (La. 1995). Initially, the interpretation of a contract is the determination of the common intent of the parties. La. Civ. Code art. 2045. To determine the parties' intent, courts must first look to the words and provisions of the contract, and "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made." La. Civ. Code art. 2046. Moreover, courts should give words used in a contract their generally prevailing meaning. Amend, 664 So. 2d at 1187; La. Civ. Code art. 2047. Each provision must be interpreted in light

---

[6]In the alternative, Omega argues the doctrine of "first material breach." However, the Court does not address the application of the doctrine because, as a preliminary matter, the Court concludes that the Contract does not release GNI from liability.

of the other provisions so that each is given the meaning suggested by the contract as a whole. Id. (citing La. Civ. Code art. 2050). "A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ. Code art. 2056. In addition, only "[i]n case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation." La. Civ. Code art. 2057.

Here, the Court must determine the effect of paragraph 9 of the Contract, which states in relevant part:

> Each party hereto agrees to release, protect, indemnify, defend and hold the other party hereto harmless from and against all liability, claims, demands and causes of action of every kind and character (including, but not limited to, the cost of the defense thereof, the cost of prosecuting and defending cross-claims and in establishing such party's right to indemnification) for injury to or death of and/or loss of or damage to property of the *indemnitor and its invitees*, howsoever caused and even though caused by the negligence of the indemnified party, its invitees or anyone for whom they may be acting.

(Am. Third-Party Compl. at Ex. A (emphasis added).) Although awkward, the language is unambiguous. To determine which party is the indemnitor, one must only determine which party (or its invitees) has suffered an injury. That party will be required to indemnify the other -- that is, the party whose employee has suffered the injury.

On its own, the language in paragraph 9 of the Contract is unambiguous, except to the extent that the term "invitees" might be susceptible to more than one meaning. However, in accordance with Louisiana law, the Court must read paragraph 9 "in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. The term "invitees" is explicitly and unambiguously defined to include "the employees,

14

employees of subcontractors of, and invitees of a party hereto." (Am. Third-Party Compl. at Ex. A.) Thus, whenever one party suffers injury to itself, its employees, or its subcontractor's employees, it is that party which must indemnify the other party, even if the injury resulted from the other's negligence.

At oral argument, GNI construed paragraph 9 as nothing more than a general mutual release for injuries occurring *on* each Party's property.[7] The plain language of paragraph 9 cannot support such an interpretation. First, if this provision was a mere general release, then the additional words "protect, indemnify, defend and hold the other party hereto harmless" would be mere surplusage. Under Louisiana law, such an interpretation must be avoided. Texaco Exploration & Prod. v. Amclyde Engineered Prods., 448 F.3d 760, 778 (5th Cir. 2006); La. Civ. Code art. 2049. Second, the plain language of this provision indicates that an injury *to* the property or person triggers the indemnity obligation, not an injury *on* a party's property, as GNI has suggested.

GNI further argues that such an interpretation of paragraph 9 would render paragraph 10 superfluous, because paragraph 10 imposes upon GNI a duty to indemnify Omega for injury to third persons caused by GNI's negligence. (GNI's Br. at 2-3 (incorporating Northern Neck's Br. at 10).) The plain language of paragraph 10, read together with paragraph 9, fails to support such a conclusion. Indeed, paragraph 10 might be surplusage if it created liability for injury to the other party or its invitees, as paragraph 9 does. But unlike paragraph 9, paragraph 10 indemnifies for injury to third parties beyond the scope of paragraph 9. Thus, the two provisions may be read

---

[7]Many of GNI's arguments were articulated by counsel for Northern Neck, and adopted by reference on behalf of GNI.

as consistent with one another. Paragraph 9 addresses injury to the parties or their invitees; paragraph 10 addresses injury to third parties generally.

Finally, the insurance requirements of paragraphs 8 and 16 of the Contract, read together with the language in paragraph 9, lend further support for such an interpretation. Although GNI construes the contract to require insurance coverage only where indemnity provisions do not apply, such a construction is not warranted by the plain reading of the Contract. (GNI's Br. at 3-4 (incorporating Northern Neck's Br. at 10).) Rather, such broad insurance coverage mandated by the Contract is designed to encompass those same injuries within the scope of indemnity. Mandating insurance need not foreclose indemnity. One who is indemnified by another would be prudent to require insurance, or find himself indemnified by a judgment-proof entity. The insurance mandate therefore complements, rather than conflicts with, the indemnity requirement.

Here, the injury is to an alleged employee of either GNI or its affiliate, Northern Neck. Thus, GNI stands in the position of indemnitor, obligated to indemnify Omega as the indemnitee, *even if* Omega's own negligence caused the injury. Were the situation reversed, and an Omega employee suffered an injury, Omega would be obligated to indemnify GNI.

Therefore, this Court recommends that GNI's motion to dismiss be denied insofar as the terms of the Contract do not release GNI from liability. To the contrary, the Contract mandates that GNI indemnify Omega.

**D.     Leave to Amend**

Where a party has already amended its pleading once, it requires leave of Court to file an additional amended pleading that addresses the deficiencies discussed herein. Fed. R. Civ. P. 15(a)(2). Although Rule 15(a)(2) instructs the Court to "freely give leave when justice so

requires," the Court "may deny leave if amending the complaint would be futile." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008) (citations omitted). Here, the Court has already permitted Omega to previously amend its pleading to state a claim to pierce the corporate veil. Under the present circumstances, it appears that further amendment on this basis would be futile, so this Court recommends that Omega be denied leave to amend at this time.

However, as this Court has previously indicated, there are other legal bases by which a third party may be bound to a contract, such as through waiver and estoppel. (Report & Recommendation at 6 n.4.) At oral argument, counsel for Omega suggested that such a theory may be developing as a result of ongoing discovery. Therefore, this Court recommends that the ruling on the present motion be without prejudice to a future motion for leave to amend, upon a showing of good cause.

### IV. CONCLUSION

In conclusion, and for the reasons discussed herein, it is the recommendation of this Court that Third-Party Defendant Northern Neck's motion to dismiss be GRANTED and that Third-Party Defendant GNI's motion to dismiss be DENIED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne, with notification to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a <u>de novo</u> review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                                               /s/
                                          Dennis W. Dohnal
                                          United States Magistrate Judge

Richmond, Virginia
Dated: <u>January 31, 2011</u>